24-2810, Western Arkansas, Get Loud Arkansas et al. v. Cole Jester et al. Mr. Franks. Thank you, your honor. May it please the court, Adam Franks for the appellants, Arkansas Secretary of State Cole Jester and the commissioners of the Arkansas State Board of Election Commissioners. The district court's preliminary injunction should be vacated based on the district court's broad construction of the materiality provision as authorizing a method of completing Arkansas voter registration applications in a manner that is inconsistent with and contrary to Amendment 51 to the Arkansas Constitution of 1874. These claims arise not from the materiality of a signature but rather the appellee's preferred method of completing voter registration applications using an online computer process. Can I ask you just real quickly a factual question, which is the wet signature rule that we're talking about today, does it apply across the board or is it just in certain circumstances? That is a great question. It applies in circumstances where persons are applying to vote outside of the enumerated voter registration agencies that were created by an amendment to Amendment 51 in 1995 to comply with the National Voter Registration Act. In that 1995 amendment, the voter registration agencies that were created were first the Office of Driver Services where folks get their driver's license, state revenue offices where folks transact their motor vehicle title and registration business. That specific voter registration agency is both authorized and required to combine the voter registration application process with the application for a driver's license or a vehicle registration title, license plate, whatever it may be. In that instance, and I'm sorry, just to clarify, to use a computer process, that is the only voter registration agency where a computer process is both authorized and required. There are other categories of voter registration agencies, but the two I want to touch on are the disability agencies and the public benefit agencies such as the offices that administer Medicaid. Those voter registration agencies are permitted to use a computer process, but they are not required to. Outside of that narrow set of three voter registration agencies, the use of a computer process is not authorized anywhere in Amendment 51 to the Arkansas Constitution. Is the idea there that with those agencies that identity, for example, the DMV, like to get a driver's license, you have to show proof of identity, whereas with outside organizations and with other ways in which to register, the identity is not quite as certain? That's correct, and I think the important textual component of identity in Amendment 51 is personage. Only a person may register to vote. Only a person may vote upon successful registration in compliance with Amendment 51. The signature or mark rule that was passed, that does not modify or restrict the text of Amendment 51. In my view, it is simply a restatement of what Amendment 51 has said following this 1995 amendment. Of course, before that, between November of 1964 and 1995, a handwritten signature was the exclusive and sole method for signing a voter registration application. Following the passage of the Federal Act and to conform with that Act, Amendment 51 was then amended in 1995 and created these three narrow scenarios where a computer process, that's the term or phrase in Amendment 51, may be used to complete a voter registration application. Otherwise, there is no authorization to use a computer process for voter registration under Amendment 51. Continuing with that thought on the identity piece and the personage piece, is an applicant who appears at physically in person. The applicant's personage is verified when they appear in person with other identifying credentials, and they complete the combined application for driver's license, services, benefits, whatever it may be. But that's the key, and that context, I think, is important. What this case is about is websites floating out in the ether of the Internet where voter registration applications are completed with an electronic signature, and that's just not authorized anywhere in Amendment 51. And this emergency rule, as it was originally promulgated in May of 24, and then the permanent rule that took effect September 1st, is simply a restatement of what is already stated in Amendment 51. Can I ask, sort of on a different subject because I want to make sure you get there, the private right of action issue. In particular, this is a clarifying question. I didn't see, and maybe there is something, 28J, but I didn't see anything talking about the Turtle Band opinion that we issued a few months ago, and then also the Medina opinion that the Supreme Court issued. And I'm going to ask, hopefully opposing counsel, the same question, but I'm wondering what's Arkansas' view of the effect of those cases for this particular case? Your Honor, I have not given treatment to those cases and do not have a view of them right now to share with the court. And frankly, on the private right of action, I recognize there's some pretty compelling authority recognizing the private right of action under the materiality provision, including in the Callinan case, which I would respectfully submit the Fifth Circuit's decision in that case should guide this court's analysis. The Callinan case is on all fours with this case, and the Fifth Circuit Court of Appeals decided that the wet signature was, in fact, material to determining qualification to vote in Texas, and I think the case is the same here. Are you telling me that you are not prepared to discuss the Turtle Mountain Band of Chippewa cases and the cases that discuss a private cause of action? That is correct, Your Honor. In keeping with the Callinan opinion, which recognized the private right of action, I would be willing to concede that issue here today.  So to be clear, you're not arguing that there's no private right of action? That's right, Your Honor. I think in keeping with consistency and uniformity for the reasons that the Callinan court found and we would request that the authorities and bases for the Callinan opinion, again, in keeping with that opinion and not sort of cherry-picking the parts of it, that is correct, Your Honor. So now Callinan has some problems, in my view. One big problem with Callinan is I think the other side is right, that it engaged in means-ends testing. I think your stronger argument was actually no private right of action, to be honest with you. But the means-ends testing, I think, presents a problem because that is not what materiality is. Materiality is about relevance or importance or pick your definition, but it's not about means-ends testing. So I wonder if in Callinan, too, they went off the rails on that. I have struggled with that, Your Honor. As you know, this claim was brought under the auspices of 1983 in the materiality provision. The materiality provision does not create the right to vote. Your Honor is spot on there that it is this right of perhaps unclear existence, at least in this circuit. But what I have struggled with and why I think Callinan is okay is the right to vote emanates from either the 14th or is recognized in, I don't think the 14th and 15th Amendment create the right to vote, but the right to vote is recognized in those amendments. And I think Callinan and its analysis of the means-ends or the competing interest was appropriate because of the right to vote, which while defined in the materiality provision and the Civil Rights Act and then Voting Rights Act when the materiality provision was enacted, I think what we're talking about when we talk about the right to vote is a constitutional right. And that's where my struggle comes in is if we are going to engage in this framework for the more fundamental constitutionally recognized rights, I think there needs to be analysis of the competing state interests for a, I guess what I'll call less fundamental statutory right. Let me sort of direct you. Suppose we disagree with the precise analysis in Callinan 2 and Callinan 1, the means-end testing, and we define materiality like evidence, some sort of, you know, in that general vein, that it's important to the outcome, it's significant, whatever, that it makes a difference. I'm throwing out a lot of synonyms, and I'm sort of paraphrasing here. But why does Arkansas meet that standard? The significant standard? Yeah, that this is significant, this is important, this makes a difference. You know, because this whole thing came from ideas like, for instance, you've got to say exactly what your age is in days, months, years, right? Which is, that just doesn't make a difference. Why does this make a difference, if we were to apply a different standard? If the court is inclined to apply a different standard, the difference that it makes, first, is in the text of Amendment 51 as it's existed since 1964, and then as amended in 1995. There are, of course, legislative ways to change that process. But what is authorized in Amendment 51 does not include this third-party online procedure for completing voter registration applications. The other reason it is significant is the handwritten signature is material in determining if the applicant is qualified or eligible to vote by absentee ballot. That application process requires a signed application, and the registrars, who are the county clerks, must compare signature on application with signature on voter registration. And so, that is the significance looking ahead, not just in the vacuum of the voter registration application on the front end. But if the applicant so chooses to vote by absentee ballot, that comparison of the signatures on the absentee ballot application is required by Arkansas law. But they compare, just to play devil's advocate, they compare digital signatures. I understand that the scan is from a wet signature, but in the end, they take these digital signatures because it's all on computer, and compare them. At least that's my understanding of the record. That is correct, Your Honor. And I don't think the preservation of records or of applications, which the record reflects, the originals are maintained for a period of 22 months, after which they are maintained in an electronic format. But yes, the wet signatures are subsequently digitized. And I also get back to this person requirement. In the court's example of comparing an absentee ballot application, which cannot be completed with an electronic signature, with an electronic signature from one of the voter registration agencies that are authorized to use a computer process, that again, on the front end, satisfies the person requirement. Someone is going in person, they are completing the application in front of an agent or employee of the voter registration agency, and that satisfies the person requirement that permeates Amendment 51. And I'm not familiar with the absentee ballot operation in Arkansas, but presumably, once you have the absentee ballot in hand, it has to go into a special envelope that has to have a wet signature on it, and then that's put in a second envelope and then mailed to the voting officials. Is that true? Well, yes, Your Honor. The absentee ballot itself has to be completed in that manner, more or less. Yes. So what you end up with, you still have two wet signatures anyhow, right? Because you have the absentee ballot application and then the absentee ballot itself. And my question really is, is the necessity of the third signature, that is on the registration as a wet signature, because you do have the digital facts only to compare, does that somehow change the analysis? Because you've got three signatures you're looking at rather than two. I don't think so, Your Honor, because the comparison that the clerks have to do under Arkansas Code Annotated 7-5-404 is on the application for the ballot in the first place. Without that comparison and a similar signature, and again the application requires a handwritten signature, the applicant for the absentee ballot is not entitled to an absentee ballot in the first place if there's not a comparable signature. Got it. Well, Mr. Franks, I have a question for you on that point. Supposedly a person registers to vote by making a mark only, but then applies to vote absentee by signing her name. Are you saying that person's not allowed to vote absentee? Your Honor, those are taken on a case-by-case basis by the clerk. There are some additional requirements for… Well, what's the answer? Where do the clerks testify as to whether they would exclude that person? Your Honor, frankly, I don't recall if that's in the record or what that declaration said on that front. What the record shows, if there is a signature, the clerks would accept a voter registration application. I don't recall offhand what, if any, evidence there was regarding the handling of a mark, an X or some other mark versus a signature. And when you spoke earlier about what you called the personage requirement and said a person would appear at some location and register to vote, were you referring only to a subset of registrants? In other words, can't people register to vote by mail without appearing before anyone? That is correct, Your Honor, and that's where the handwritten signature would be required or one instance where a handwritten signature would be required, and it is that handwriting that confirms the personage. This is not some computer-generated signature, Mark. But I thought you were saying that a handwritten signature is not acceptable if it's written with a stylus. Your Honor, it is acceptable if it's written with a stylus. at the Office of Driver Services, a state revenue office, a disability agency, or a public benefits agency. That computer process... No, but I mean if it's submitted without a personal appearance, I understood you to say a handwritten signature or a mark is acceptable if it's written with a pen, but it's not acceptable if it's written with a stylus, the same signature. Is that correct? That is correct. That is what the signature mark rule requires. Okay, thank you. I'll reserve the rest for rebuttal. Thank you. Mr. Nkwanta? Good morning, and may it please the Court. Uzoma Nkwanta on behalf of the appellees. Congress enacted the materiality provision of the Civil Rights Act to address the long and unfortunate history of state election officials rejecting prospective voters based on purported errors that were hyper-technical and in some cases invented. Yet that is precisely what happened to Get Loud Arkansas and the voters they support. On three occasions, Arkansas' Secretary of State's office confirmed that electronic or digital signatures were acceptable for mailed voter registration applications, and even the state's Attorney General agreed. But when GLA's success in registering young voters with digital signatures drew media attention, the Secretary quickly reversed course. The Board of Election Commissioners rushed to adopt a wet signature requirement, all this despite the undisputed fact that election officials do not consider the type or texture of signatures in determining voter qualifications. The District Court saw this about face for what it was, a plain violation of the Civil Rights Act, and this Court should affirm. So I want to ask about something. They make the argument about fraud, and unfortunately Arkansas doesn't pin it down as precisely as I would like, but when you distinguish between when they require a wet signature and a digital signature, it makes total sense, at least to me, and I'll tell you why. Because you, in person, they do make that argument when you're at one of these offices. You already have to establish your identity. But if you're a third-party organization getting people registered to vote, a wet signature at least shows that that person signed it and that signature was not lifted from another document. I'm not saying that happens. I'm saying that that could be a legitimate explanation for why it prevents fraud. I'm not very sophisticated, but I could probably take a signature and move it from one document to another using Adobe Acrobat. And I'm not saying that's what's happening. I'm saying that that could be a compelling or rational reason for doing what they're doing. And so I want you to address that, because that is the difference between digital and wet signatures. You really can't lift a wet signature from another document. Certainly, and three separate responses to that. The first I'd like to point to the text of the statute, because the text of the statute really drives how this inquiry should occur. And the inquiry is based, is a practical inquiry, one that's fact-based. In other words, it's not enough to hypothesize potential abstract interests like fraud prevention that may be relevant or that may be material in determining voter qualifications. What's at question is whether the election officials use the wet signatures as opposed to the digital signatures or the appearance of the signature in determining voter qualifications, right? Because the phrase in determining, those are function words that indicate something is actually occurring. But suppose it's lifted. Is that person, it's lifted, the person never signed the document. Is that person properly registered or qualified to vote? Sorry, if the signature is lifted? If the signature is lifted. That person never had, never signed the form. They signed a letter that they sent to somebody, and that signature was lifted and taken from one document to another. Is that person properly qualified to vote? That person is properly qualified if they're the ones that entered that signature. I'm saying they entered the signature in a document, a letter, and then it was lifted and put on their voter registration forms. They never registered to vote. Well, it's still that person indicating that they agree with the elements or they agree with the statement which they're signing. And that's really how individuals demonstrate agreement with whatever's on the document. I don't think you're understanding the question. It's completely lifted. They have no knowledge that that was put on the voter registration form. I see. If they have no knowledge it was put on the voter registration form, yes, then that would be a problem. But in terms of fraud prevention, the record is undisputed that the signature, the texture of the signature, is not how election officials determine whether the individual filling out the application is the right individual whose name is on the application. In fact, federal law actually prescribes the procedure for that. Under the Help America Vote Act, the individual who's submitting a mail voter registration application must provide either their driver's license number or the last four digits of their Social Security number. And election officials then must match that with their records. And if it doesn't match, then that individual is required to provide ID the first time they vote, either by mail or in person. So those are the procedures that are actually set forth and required by federal law that allow election officials to verify an individual's identity. And when you look at the record in this case, no one has suggested that election officials use the texture of the signature in verifying voter qualifications. In fact, just the opposite. We had at least one election official testify that that is not what occurs. Instead, they look at the signature just to ensure that a signature is there, as an indication that there is a signature existing. And Amendment 51 itself even suggests that the texture of the signature shouldn't matter because it allows not just a signature but a mark. So if someone puts an X there, according to opposing counsel, the X would be sufficient, but a signature, a digital signature would not. And there's no rhyme or reason for that. So that's the fraud prevention interest or the fraud prevention rationale that they present is abstract. It is not the actual rationale here, and it is not the actual operation. It's not how this is used, and no one uses the signature in determining qualifications. You know, your argument is that it's abstract, and I'm not sure I follow exactly what the process is because the government argued that they had to prove identity to establish appropriate personage when they are present to register at the various authorized agencies, right? And you're saying that all you really have to do is produce a driver's license number or the last four digits of your Social Security number. I mean, is it really true that they would allow you to walk in and say, my driver's license is blah, blah, blah, blah, blah, and my date of birth is X, and that that's sufficient identification? Or are they going to ask you to produce your driver's license so they can look at it? Well, that is sufficient identification when you're registering to vote by mail. So Arkansas allows anyone to register to vote by mail, and anyone who's registering to vote by mail can do so by providing either that identification number, driver's license number, Social Security number, or providing identification with their application. So when you're in a DMV, yes, you may have to provide the actual physical copy of the driver's license, but there are other reasons for that and reasons that are bound with other functions that you conduct at the DMV. It goes to what opposing counsel was mentioning earlier about the computer process referenced in Amendment 51. Real quickly on Judge Erickson's question, though, I mean, isn't that a material difference? I'm talking about the fact that you've already produced evidence showing that you are who you purport to be at a DMV, and with regard to a mail-in ballot, they don't see you, they don't know who you are, they don't know who signed it, and maybe the wet signature rule is not an effective way of doing it, but it could go towards saying at least a real person signed it, and the person is a real person, and it's the same person who they purport to be, and then you can compare it later. I understand they compare digital signatures, but my understanding is they scan the wet signature, and you can correct me if I'm wrong. So two responses to that. The question of materiality occurs at the initial determination stage. So the initial determination as to whether someone is qualified to register, and that's set forth in the definition of vote in Section 101.01, subsection E. So it has to be material in determining whether someone is qualified to register as well, not just to vote, but to register. And so the fact that the signature may be used later on to determine whether someone should receive an absentee ballot is actually aside from the point because under Section 101.01E and the way it defines vote to include registration, election officials cannot reject an application because of a wet signature that is not material in determining whether that person is qualified to register. So changing the facts slightly, because I want to key in on that exact point, suppose Arkansas decided it has a history 200 years long of requiring a wet signature for everybody. Whether you go to the DMV or not, you have to go into a registration office, you have to sign the form. That's the only requirement we have. Are you telling me that Arkansas could not do that because it's not material to determining whether you're registered to vote? Well, Arkansas can require it. The problem is Arkansas can, and when I say Arkansas cannot do that, I'm speaking in the abstract, which is something that I would not do in this case. Instead, I would point the court to the record. I'm not saying that under no circumstances no state can ever impose a wet signature requirement. What I'm saying is the determination under Section 101.01 is a fact-based determination, and what's critical here is the record and whether Arkansas election officials actually use the distinction between wet and digital signatures in determining qualifications. And the record is undisputed that they do not. They just — and that record was identified in the district court's opinion. They just look to see whether there is a signature there. If there's an X there, that's fine. If there's any mark there, that is fine. And that makes sense because there are other more comprehensive specific procedures for verifying identity. The ones that I just laid out, they're actually prescribed by federal law. And so it makes sense why Arkansas election officials do not use the texture of the signature to determine whether someone is qualified or in determining whether someone is qualified. And the defendants have not presented any evidence whatsoever of how the texture of the signature is actually used. Now, going to the comparison between voter registration application signatures and absentee ballot signatures, even if that were a relevant consideration here, remember that the comparison for the most part happens between digital signatures and wet signatures because in many states, and I don't see why Arkansas would be different, most voters actually register at the DMV when they obtain their licenses, right? And so the digital signature that's entered at the DMV, that is a signature that's usually compared. There's nothing out of the norm with comparing a digital signature and a wet signature on an absentee ballot application. And then moving on to the discussion about the computer process that Amendment 51 permits only for registration agencies, one, regardless of what Amendment 51 permits, federal law here would have to yield to federal law. And federal law does not permit Arkansas to pass restrictions or requirements that allow immaterial omissions or errors to result in disenfranchisement. Putting that aside, Amendment 51 does not even say what opposing counsel says. The computer process referenced in Amendment 51 is the process of combining the driver's license application with the voter registration application. That's why it authorizes a computer process because that combination is actually, again, required by federal law. Under the National Voter Registration Act, when someone goes to apply for a driver's license or an ID with a state, the state is required to use that application as a voter registration application as well if that individual is qualified. And the state is not permitted to duplicate information. So that's why there's a computer process that allows a state to combine the driver's license application and the voter registration application. And it has nothing to do with wet signatures or what type of the method in which you should enter the signature. I also want to remind the Court that Arkansas state election officials themselves did not believe that a wet signature was required in order to register. Rather, they stated on separate occasions, the Secretary of State's office stated on three occasions, in three separate communications, that a wet signature was not required. The Attorney General issued a formal opinion stating that Arkansas law did not require wet signatures and that additional signature was sufficient. It was only after Get Loud Arkansas started this process that the SBDC then enacted this emergency rule. And that's why we're here, not because any state official actually believed there was a wet signature requirement. I'd like to move on to some of the discussion about the private right of action that Your Honor raised here. And a couple of things I want to confirm about the Court's opinion in Turtle Mountain and the private right of action argument. It sounds like and sounds like they very clearly forfeited that argument before this Court. And because it's not jurisdictional, the inquiry can end there. Did they forfeit or did they waive it? I thought I heard him say we concede there's a private right of action. That would probably be a waiver, wouldn't it? You are correct, Your Honor. That is an explicit waiver rather than near forfeiture. To the extent that this Court wishes to discuss it further, I'm happy to answer any questions. But I would point the Court to the other three circuits that have found that the materiality provision imposes or prevents a private right of action that can be enforced through Section 1983. I'd also point to the differences between the materiality provision and the other provisions that courts have found did not convey a private right of action. For instance, the fact that the materiality provision is nested within a section of the Civil Rights Act that is titled voting rights. And then the provision itself has a specific individual rights focus. It starts by stating that no election official shall deny the right to vote. And even the qualifier is also individual focused. The qualifier in determining whether such an individual is qualified to vote. Okay. So this may be academic at this point. It probably is. But I think the argument is pretty weak in light of Turtle Band and NAACP versus Board of Apportionment. Because if you look at the surrounding two provisions, there's a header and then there's three individual provisions. The only one that mentions a right is this one. Both of the accompanying ones don't even mention a right. A and C. I believe this is B. And so it would be really, really, really odd for them to create a right on three complementary provisions, but only one of them would be enforceable under Section 1983. Certainly. And understanding that it may be academic at this point because of the waiver, I would point to the actual main section. Because those three surrounding sections you mentioned are all subsections of the main section, which is 10101, subsection 1, all citizens of the United States shall be entitled to vote. And I'm paraphrasing here, not quoting. But the main section makes clear that Congress is establishing that citizens are entitled to vote and is creating an affirmative right. And then the subsections further define that right. Now, some of them are stated in terms of the election officials and what they can or cannot do. But the subsection 2B is stated in terms of the individual right. And that's – But you're feeding my point. You're actually feeding the exact point I make, which is 2B talks about in terms of rights, but then A and C have no rights-creating language. The header talks about under color of state law. Nobody under the color of state law, and I'm paraphrasing. And then A includes no rights language. C includes no rights language, at least in my reading. And B is the one that does it. So I think you are arguing that B would be rights-creating and that A and C may not be. When you say B, just to make sure we're talking about the same provision, 101A to B, the materiality provision, yes. And I was speaking about A and C. So I was comparing. So just to be clear, yes. Yes. So whether A and C have rights-creating language doesn't necessarily impact whether B has rights-creating language and can actually support a private right of action in Section 1983. It's a textual analysis. And the text of Subsection B clearly has rights-creating language. And when you look at the entire structure of the Section 10101, you'll see that that is not the only provision that has rights-creating language. There, you know, I mentioned Subsection 1. That provision has rights-creating language as well. And that indicates Congress's intent there to have rights-creating language and to allow Section 1983 claim to enforce that right. Now, in addition to the arguments that opposing counsel has made about what Amendment 51 means, just to switch gears for a second, opposing counsel has also spent a significant amount of time talking about, you know, the State interest in one of them, as you mentioned, fraud prevention, also mentioned, you know, State interest in ensuring that Amendment 51 is followed, even if Amendment 51 meant what opposing counsel said. One thing I wanted to point out to the Court is that the focus on State interest, both in Cowlin and in opposing counsel's brief, is incorrect. It is not the right way to interpret the statute. And the reason is when you are encountering a constitutional action, an action that a law violates the constitutional right to vote, for instance, there is a balancing of the State interest because you're balancing the constitutional right with the State's constitutionally assigned authority to enact election laws and election procedures. However, when Congress passes a law that impacts voting rules, it's necessarily displacing some element of a preexisting legal regime that's enacted by the States. So what Congress is doing is Congress is effectively preempting the States, and Congress is intentionally telling the States what provisions it can enforce and telling the States what restrictions can be imposed on voters and cannot. So the text of the statute is the guideline and is the touchstone in determining what the State interests are. When it's a constitutional right to vote claim, the Court must balance the interests. When you're looking at a statute like the Civil Rights Act and the materiality provision, Congress has already balanced those interests. And the text of the statute is the reflection of Congress's determination. Let me just ask you one quick question. Voter ID, we have a case 20 years ago, 18 years ago, whatever, from the Supreme Court. How is this different from voter ID in your view? Well, this is different from voter ID because the materiality provision itself has a number of limitations. I see my time has expired. No, in terms of materiality. Go ahead.  One of the limitations in the materiality provision is that the error or omission must appear on a paper, right? It's like it's a paperwork requirement.  And when you're showing voter ID, there's not an error or omission on a form or a paper that's requisite to voting, but a voter registration application is precisely the type of form that's covered by Section 110 on A2B. Thank you, Mr. McLaughlin. Thank you. Mr. Frakes or Rebuttal. Thank you, Your Honor. And if the court would permit, I would propose to file a Rule 28J citation to the Turtle Mountain Band case that I see was decided in June of this year following the briefing in this matter, and will do so expeditiously. Well, what do we do about – it seems to me that you've already waived it. So are you – I don't know if this is allowed, but are you unwaiving it? I'm trying to figure out what use that would be. Well, in light of the court's questions and the posture of this case relative to that more recent decision, I would ask to be permitted to submit a citation to supplemental authority on that issue. If you do that, would you please submit a supplemental authority on whether or not you can unwaive in the oral argument if you can find any authority for that? Because it seems to me that rebuttal is not usually a place where we allow people to completely change their position. I understand, Your Honor. I've made a note of that. Getting back to the Appellee's arguments, the Secretary of State's opinions are subject to constitutional rulemaking in Amendment 51. Attorney General opinions are not binding on the Arkansas Supreme Court or this Court, and the inconsistent acceptance is what precipitated the passage of the rule and furtherance of uniform, efficient, and consistent elections. That ties in with the fraud piece, and as the Court knows, states don't have to wait for actual fraud to happen before enacting valid regulations on access to the franchise. One final thought. When a mark is put on a voter registration application, Amendment 51 requires the identification of the person providing assistance if an applicant is unable to sign his or her name. That is yet another identification of a person involved in the application process. Thank you. Thank you, Mr. Franks. The Court would thank counsel for their briefing and arguments here. It's been helpful. The Court will take the matter under advisement and rule forthwith.